**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION NO.** |
| v. | **1:23-CR-66-MHC-CCB** |
| **KIARA PATRICE MOORE,** | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

Defendant Kiara Patrice Moore (Defendant or Moore) is charged with conspiring to make false statements to a firearms dealer in violation of 18 U.S.C. § 371 (Count 1); and making false statements to a firearms dealer in violation of 18 U.S.C. § 924(a)(1)(A) (Counts 3–14). (Doc. 1).[1] She has filed a motion to suppress statements that she made to law enforcement agents on August 20, 2020. (Doc. 38). The Court held an evidentiary hearing on January 8, 2024. (Doc. 45). Defendant filed a post-hearing brief, (Doc. 50), the Government filed an omnibus response to this and other motions, (Doc. 55), and Defendant filed a reply, (Doc. 56). For the

---

[1] Defendant Horace Donte Dulaney is also charged in these and other counts. I addressed Defendant Dulaney's pre-trial motions in a separate Report and Recommendation. (Doc. 62).

reasons explained below, I **RECOMMEND** that the motion to suppress be **GRANTED**.

I.   **FACTS**

   A.   **Events Leading up to the Day of the Traffic Stop and Arrest**[2]

The indictment in this case reveals an investigation that unfolded between March 8, 2020, and August 20, 2020. (Doc. 1 at 3–8; Doc. 45 at 16).[3] Over that time period, Defendants Dulaney and Moore purchased 49 firearms and are alleged to have attempted to purchase three others. (Doc. 45 at 25; Doc. 1 at 3–8). The first alleged transaction occurred on March 8, 2020, when Dulaney attempted to purchase a pistol at a gun show in Marietta, Georgia. (Doc. 45 at 18–19; Gov't Ex. 8).[4]

Agents subsequently identified transactions in which Defendant Moore purchased firearms at stores in the Northern District of Georgia. (Doc. 45 at 24–25;

---

[2] The Court presents this background information solely to set the stage for understanding why Defendant was later making statements to the agents that she now seeks to suppress.

[3] Document 45 is the transcript of the evidentiary hearing. All citations are to the CM/ECF page numbers stamped on that filing.

[4] The Court cites exhibits that were introduced by the Government at the evidentiary hearing held on January 8, 2024.

Doc. 1 at 3–8). Specifically, agents identified transactions in which Moore purchased 40 firearms at various stores between March 21, 2020, and August 15, 2020. (Doc. 45 at 24–25; Doc. 1 at 3–8). Agents went to the stores where Moore purchased the firearms and obtained the ATF Forms 4473 that she completed at the time of the sales. (Doc. 45 at 112–13). At one of the stores, Grove Pawn, the clerk told agents that during purchases of firearms on August 14 and 15, 2020, Moore was accompanied by a black male and that his debit card was used to fund part of the purchase, along with Moore's debit card. *Id.*

Agents obtained records showing that Moore purchased six firearms at Grove Pawn on August 14, 2020. (Doc. 45 at 23; Gov't Ex. 9). Video surveillance from Grove Pawn shows Moore and Dulaney together inside the store on August 14, (Doc. 45 at 21–22), and the purchase on that date was paid for in part using a debit card in the name of Kiara Moore and in part using a debit card in the name of Horace Dulaney, (Gov't Ex. 9). In fact, although Moore is identified as the purchaser on the Form 4473, surveillance photos from the store shows Dulaney carrying out the boxes of firearms. (Doc. 45 at 22; Gov't Ex. 6).

Moore purchased two more firearms from Grove Pawn the next day, on August 15, 2020. (Doc. 45 at 19–20; Gov't Ex. 5). Surveillance photos from Grove

3

Pawn show that Moore and Dulaney were in the store together during the purchase on August 15. (Doc. 45 at 20; Gov't Exs. 5, 6).

### B. The Day of the Traffic Stop and Arrest

On August 20, 2020, the owner of Grove Pawn called now-former ATF Special Agent Jonathan Gray and advised him that Moore was back in the store attempting to purchase more firearms and that the Black male gentleman that was with her previously was there as well. (Doc. 45 at 129–30). Agent Gray and Special Agent David Diaz drove to the store, in separate cars, to conduct surveillance. *Id.* at 130–31. The clerk of the store told Agent Gray when the purchase was being completed, and Gray saw Moore and Dulaney exit the store. *Id.* at 131–32. Dulaney was carrying five boxes of firearms. *Id.* at 115–116. Dulaney put the firearms in the back driver's-side seat of a white Nissan Pathfinder, he and Moore got into the vehicle (with Dulaney driving), and they left Grove Pawn. *Id.* at 115–16, 132; (Gov't Ex. 7 (photographs)).

Agent Gray followed Dulaney and Moore up Interstate 85 and contacted the Georgia State Patrol (GSP) for assistance. *Id.* at 114–15. A GSP trooper stopped Dulaney's vehicle for failing to maintain its lane. *Id.* at 76. The stop occurred near Commerce, Georgia, which is about 30 miles south of the South Carolina state line. *Id.* at 78. Troopers approached the car and immediately smelled a very pungent

odor of marijuana. *Id.* at 104. The troopers put Dulaney in handcuffs and searched the vehicle. *Id.* at 101, 104; (Gov't Ex. 1 at 21:05:44–21:06:10).[5] Inside they located nine firearms, three cell phones, marijuana, a grinder, and a scale. (Doc. 45 at 32). While searching the vehicle, one of the troopers plainly observed a cell phone that was in navigation mode. *Id.* at 84. The phone showed that the vehicle was traveling north on I-85 and had three or four more hours until arriving at the programed destination, which suggested to the trooper that Moore and Dulaney were headed out of state. *Id.* at 84–85.

GSP troopers and ATF agents had several conversations with Moore at the scene of the traffic stop. The Government has represented that it will not use in its case in chief any of the statements Moore made to the trooper. (Doc. 45 at 100). As such, the Court focuses on the statements she made to the ATF agents.

Agent Gray, along with Agent Klein, interviewed Moore in Agent Gray's vehicle. *Id.* at 137. Agent Gray told Moore that she was not under arrest. (Gov't Ex. 12A at 1:20–1:27).[6] He asked Moore for her address, phone number, and where

---

[5] The time reference from the dash-cam video refers to the time that appears at the top of the screen next to the notation "eventDate."

[6] Moore's interview recording is Government Exhibit 12. The electronic recording within Exhibit 12 is divided into three parts, labeled as "Part 1 of 3," "Part 2 of 3," and "Part 3 of 3." For ease of reference, I refer to "Part 1 of 3" as

she was going. *Id.* at 3:10–4:50. Moore gave the agent the relevant information, including that she was going to visit her mother in North Carolina, who was sick and going to the hospital. *Id.* He also asked her about gun purchases. *Id.* at 4:50–5:20. Gray then reiterated that Moore was not under arrest, and he read *Miranda* rights, including that she had the right to remain silent, that anything she said can and will be used against her, that she had a right to an attorney, and that a lawyer would be provided to her if she could not afford one. *Id.* at 5:20–6:20. Moore said she understood her rights but was "confused" because she understood that people only get read their rights when they were under arrest. *Id.* at 6:20–6:45. Gray reminded her that she was not under arrest but that he was reading her rights because they were on the side of the road and she could not get up and leave. *Id.*; (Doc. 45 at 137). Moore agreed to talk to the agent. (Gov't Ex. 12A at 6:45–6:55).

The conversation lasted for about 45 minutes. (Gov't Exs. 12A, 12B, 12C). The Court does not recount the entirety of the conversation here, but refers to specific portions as relevant in the discussion below.

---

Exhibit 12A; "Part 2 of 3" as Exhibit 12B; and "Part 3 of 3" as Exhibit 12C.

## II.   ANALYSIS

### A.   Statements Made Prior to *Miranda* Warnings

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted). "Because the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *United States v. Hicks*, 546 F. Supp. 2d 1378, 1381 (N.D. Ga. 2008) (internal quotation marks omitted). "The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, or whether some exception to the *Miranda* rule applies."

7

*United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014) (internal quotation marks, citations, and footnote omitted).

As noted above, Moore made several statements to Agent Gray prior to when he read her *Miranda* warnings. The Government represented at the hearing that it would not use in its case in chief any of those pre-*Miranda* statements other than the "general biographical information," including Moore's name and address. (Doc. 45 at 123–24).

The Supreme Court has recognized a "routine booking question exception" that exempts from *Miranda*'s coverage questions to secure "biographical data necessary to complete booking or pretrial services." *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (internal quotation marks omitted). The exception allows officers to ask questions about a person's name, address, height, weight, eye color, date of birth, and age, which are deemed to be administrative in nature and therefore outside the protection of *Miranda*. *Id.* at 601–02. Nevertheless, even during booking, officers are not permitted to ask questions that are designed to elicit an incriminating response. *Id.* at 602 n.14. As the Eleventh Circuit has explained:

> We emphasize that police may not use routine biographical questioning as a guise for obtaining incriminating information. If investigative questions are asked while routine information is being obtained—as apparently were asked in this case—answers to such questions are inadmissible if the suspect has not been read his Miranda rights. Even questions that usually are routine must be

> proceeded by Miranda warnings if they are intended to produce answers that are incriminating.

*United States v. Glen-Archila*, 677 F.2d 809, 816 n.18 (11th Cir. 1982) (internal citation omitted).

Here the Government notes that "booking information" does not amount to interrogation for purposes of *Miranda*, (Doc. 55 at 23), but it does not explain how or why the "booking information" exception should be applied to the questions in this particular case about Defendant's name and address. Defendant argues that the question about Defendant's address was intended to elicit incriminating information because the agents began working on a search warrant application for Moore's address immediately after the traffic stop. (Doc. 56 at 2). The agents wanted to see if the guns at issue were at her address, Defendant argues. *Id.* Moreover, Defendant maintains, the answer to the question would be incriminating no matter how she answered. If she lied and gave a residential address that was not where she actually lived, "that would show her to be hiding something." *Id.* at 3–4. If she gave her true residential address, Defendant maintains, "a search would likely show that at least some of the purchased guns would not be there, which would also be incriminating." *Id.* at 4.

The Government has the burden of demonstrating that the circumstances surrounding the statements meet the routine-booking exception. *United States v. Stroman*, No. CRIM 05-66-P-S, 2006 WL 83404, at *16 (D. Me. Jan. 9, 2006), *adopted by* 2006 WL 348321 (D. Me. Feb. 14, 2006). Here, as noted above, the Government offers nothing other than an acknowledgement that the exception exists: "Booking information, such as a defendant's biographical information, is not interrogation under *Miranda*, even though that information may turn out to be incriminating. *United States v. Sweeting*, 933 F2d 962, 965 (11th Cir. 1991)." (Doc. 55 at 23). The Government does not apply the exception to the facts of this case or opine on whether the question about Defendant's address was intended to induce an incriminating response. *See Glen-Archila*, 677 F.2d at 816. And while asking a defendant her address is "reasonably related to the police's administrative concerns" and usually within the routine-booking exception, *United States v. Sanchez*, 334 F. Supp. 3d 1284, 1301 (N.D. Ga. 2018), here Defendant's address has particular evidentiary significance. Indeed, the indictment alleges that her address is one of the very things that Moore lied about on the ATF forms that form the basis for Counts 8 through 14 of the indictment. (Doc. 1 at 12 (alleging that Moore "falsely represented that MOORE'S address was then 2562 Field Spring Drive, Lithonia, Georgia, when, in fact, as MOORE and DULANEY knew at the time,

10

MOORE was not residing at that address"). And the dates relevant to those counts—in other words, the dates on which Moore allegedly lied about where she was living—occurred within days of when the agents asked her for her address. The interview occurred on August 20, 2020, and the dates alleged in Counts 8 through 14 range from July 8 to August 20, 2020. (Doc. 1 at 10–12).

This is not a situation where the significance of the answer to an otherwise innocuous question for routine biographical information only becomes obvious at some later point. Here, where Moore was living (or, perhaps more precisely, where she was not living) on August 20, 2020, and the days immediately preceding that date, is a part of what the Government will have to prove for Counts 8 through 14 of the indictment. And understandably, the Government was very much interested in that address—Agent Norris testified that she started working on a search warrant the morning after the traffic stop because they wanted to "confirm whether those guns were present at that location." (Doc. 45 at 48). Given the centrality of Defendant's actual address to the allegations in the indictment and the Government's subsequent investigation, and in the absence of any argument from the Government applying the facts of this case to the routine-booking exception, I find that the Government has not met its burden of demonstrating that

the exception applies. As such, I **RECOMMEND** that the Court suppress Defendant's pre-*Miranda* statements about her address.

### B. Voluntariness of Defendant's Statements

Defendant argues that her statements to Agent Gray were not voluntary. (Doc. 50 at 3–11). Specifically, in nine bolded paragraphs, she offers reasons why, when considered together, her statements were not voluntary: (1) Agent Gray made it clear to Moore that she was not free to leave; (2) the agents misled her into thinking she did not have the right to leave the particular vehicle where the questioning was taking place; (3) Agent Gray's reading of the *Miranda* rights was confusing and self-defeating because he essentially told her that she was both under arrest and not under arrest; (4) both agents were visibly armed and physically surrounded her while she was in the vehicle; (5) Moore was anxious because she was on her way to see her mother, who had just been taken to the hospital; (6) the agents threatened to cut Moore off from both her ailing mother and her children; (7) the agents made implied promises to keep Moore talking; (8) Agent Gray "extensively harangued" Moore about all of her misdeeds, as well as those of her husband; and (9) Moore was arrested after the interrogation. *Id.* at 4–10. Throughout her argument, Defendant cites to specific statements the agents made in support of her arguments. (*See, e.g., id.* at 6–7 (citing to Agent Gray's

12

statement "But it's a little different when you're sitting in a police car with federal agents. You have two kids to think about."), *id.* at 9 (citing to Agent Gray's statement "This isn't going to end well unless you start with the truth.")).

The Government does not meaningfully engage with any of Defendant's arguments. Rather, in conclusory fashion, it states that "Moore's statements were voluntary. Agent Gray did not threaten, beat or otherwise force her to make a statement. Moore's statements were not the product of coercion." (Doc. 55 at 27). The Government then maintains that Moore's will was not overborne by Agent Gray's many attempts to get her to change her story—she stuck to her narrative, even when the agent confronted her with alleged inconsistencies. *Id.* at 27–28. Nor, the Government points out, did Moore consent to a search of her residence—further proof that "her will was not overborne." *Id.* at 28. In reply, Defendant argues that by not responding to any of her arguments, the Government should be deemed to have forfeited any response. (Doc. 56 at 4). And she addresses the Government's arguments about Defendant sticking to her guns (even in the face of inconsistencies) and declining to consent to a search of her residence. *Id.* at 5–6.

Separate and apart from *Miranda*, the Court "still must determine that any confessions or incriminatory statements made by a defendant were voluntary" before those statements can be admitted at trial. *United States v. Lazarus*, 552 F.

13

App'x 892, 895 (11th Cir. 2014). A court looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an essentially free and unconstrained choice." *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted). Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." *Id.* at 1253.

"Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." *United States v. Patterson*, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (internal quotation marks omitted). "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." *United States v. Thompson*, 422 F.3d 1285, 1295–96 (11th Cir. 2005) (internal quotation marks omitted). "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." *United States v. Lall*, 607 F.3d 1277, 1285 (11th Cir. 2010).

14

Moore contends that the Government's brief addresses only *Miranda* and does not consider voluntariness. (Doc. 56 at 4). This is not exactly correct. The Government addresses voluntariness in its brief. (Doc. 55 at 27–28). But it does not specifically respond to a single one of the many facts that Defendant suggests, collectively, render her statements involuntary.

And this is not a situation of one party failing to address a throw-away or insignificant argument in an opposing brief. By virtue of the fact that Defendant filed the opening post-hearing brief, the Government knew exactly what Defendant was arguing and why, in Defendant's view, the statements were not voluntary. At that point, the Government's obligation is to engage with Defendant's argument and explain why it should or should not prevail. I appreciate that the Government has additional reasons to support its view that the statements were voluntary (that Defendant's will was not overborne by the agent pointing out alleged inconsistencies and as evidenced by her refusing to consent to a search), and it is appropriate to point those out. But fundamentally, the Government had to engage with Defendant's argument and explain why the circumstances cited and meticulously laid out in Defendant's brief do not render the statements involuntary. That it did not do. And as such, the Government has

failed to carry its burden, and Defendant's motion to suppress the statements as involuntary should be **GRANTED**.[7]

## III. CONCLUSION

For the reasons explained above, I **RECOMMEND** that Defendant's motion to suppress statements, (Doc. 38), be **GRANTED**. This case is certified ready for trial.

**IT IS SO RECOMMENDED,** this 23rd day of August, 2024.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

---

[7] Two points are worth noting. First, I am not making a finding that the statements were involuntary. I find only that the Government has not met its burden of showing that the statements were voluntary. This is a scenario where the identity of the party with the burden matters. Second, this is not intended to be a nit-picky "gotcha" kind of outcome where a party misses an argument in a footnote or addresses the majority of the other side's facts but omits a few. That is not what occurred here. Defendant, in bolded typeface, identified nine separate facts that she argues collectively render her statements involuntary. The Government did not address any of them. In that scenario, I am hard-pressed to conclude anything other than that the argument is unrebutted. And that is an untenable position for a party with the burden.